AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

### for the

### Middle District of Pennsylvania

*FILED*
*HARRISBURG, PA*
*JUL 24 2024*
PER _____
*DEPUTY CLERK*

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Samsung Galaxy A02s, bearing IMEI #<br>357014535818918, | )<br>)<br>)<br>)<br>)<br>) |

Case No. 1:24- MC- 0594

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment "A"

located in the _____ Middle _____ District of _____ Pennsylvania _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment "B"

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 18 U.S.C. §924(c) | Possession of Firearm in Furtherance of Drug Trafficking |
| Title 21 U.S.C. §841(a)(1) | Possession with Intent to Distribute a Controlled Substance |

The application is based on these facts:

I, Deputy Christopher Warden, being first duly sworn, hereby depose and state as follows:

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days* _____ *) is requested under*
18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

**Deputy Christopher Warden**
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means)*.

Date:  JULY 24, 2024

*Judge's signature*

City and state:  Harrisburg, PA

Daryl F. Bloom, U.S. Magistrate Judge
*Printed name and title*

## CONTINUATION OF AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.      I am a Deputy United States Marshal (DUSM) with the United States Marshals Service (USMS) in the Middle District of Pennsylvania (M/PA). I have been so employed since June 2022. In November 2022, I graduated from the United States Marshals Service Basic Deputy Training Program at the Federal Law Enforcement Training Center (FLETC) in Glynco, GA. This training academy at FLETC included courses pertaining to the seizure, preservation, and search of digital evidence. Prior to being a DUSM, I was employed as a Deputy Sheriff in the Commonwealth of Pennsylvania for approximately six years. From November 2017 through June 2022, I was duly sworn with the United States Marshals Service Fugitive Task Force in the Middle District of Pennsylvania—Williamsport. I have investigated and assisted in hundreds of fugitive investigations involving different violations of Federal and Pennsylvania law. At present, my responsibilities at the USMS include conducting criminal investigations and investigations to locate and

apprehend fugitives from justice of federal and state criminal violations. As of June 2023, I am the District Sex Offender Coordinator (DSOC) for the USMS M/PA and am responsible for conducting federal investigations of individuals who have violated the Adam Walsh Act by failing to properly register under the Sex Offender Registration and Notification Act (SORNA).

3.      The facts and circumstances of this investigation have been summarized for the limited purpose of establishing probable cause for the warrant sought. No attempt has been made to set forth the complete factual history of this investigation or all its details.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

4.      The property to be searched is a Samsung Galaxy A02s, bearing IMEI # 357014535818918 hereinafter the "Device." The contents of the Device were previously extracted pursuant to a search warrant and the data from the Device is stored on a USB drive currently located at The United States Marshals Service, 1501 N. 6th Street, Room 204, Harrisburg, PA, 17102.

5.      The Device is currently in the lawful possession of the United States Marshals Service (USMS). It came into the USMS's possession in the following way. The Pennsylvania State Police (PSP) seized Eric HAGGINS' cellphone incident to arrest. This cellphone remained in PSP evidence. The USMS applied for a search warrant to search HAGGINS' cellphone for evidence of 18 U.S.C.

2250(a) Failure to Register, Title 18 U.S.C. § 922(a) Unlawful Transportation of Firearms, and Title 18 U.S.C. § 922(g) Possession of a Firearm by Prohibited Person. This search warrant was approved by the Honorable United States Magistrate Judge Daryl F. Bloom, and it is docketed at 1:24-MC-0089. The data from the phone was extracted and a copy of the data is now stored on a USB drive. During the lawful search of the data extracted from HAGGINS' phone bearing IMEI # 357014535818918, evidence was observed that HAGGINS has committed additional violations of federal law. Specifically, Title 18 U.S.C. §924(c) Possession of Firearm in Furtherance of Drug Trafficking and Title 21 U.S.C. §841(a)(1) Possession with Intent to Distribute a Controlled Substance.

6.     The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying and seizing electronically stored data particularly described in Attachment B.

7.     As set forth below, there is probable cause to believe that the Device contains evidence and instrumentalities of violations of Title 18 U.S.C. §924(c) Possession of Firearm in Furtherance of Drug Trafficking and Title 21 U.S.C. §841(a)(1) Possession with Intent to Distribute a Controlled Substance.

## PROBABLE CAUSE

8.     On November 29, 2023, the United States Marshals Service—Middle District of Pennsylvania received a Jail Facility Tip from the York County

Sheriff's Office Central Booking Center regarding Eric Clarence HAGGINS Jr. The tip indicated that HAGGINS is a registered sex offender in Maryland and that he had recently been arrested in York County, Pennsylvania. I reviewed the information and initiated an assessment.

9.     I learned the following based on my review of Maryland Court Documents and records, HAGGINS' Criminal History, documents and records associated with HAGGINS' Maryland Sex Offender Registration, HAGGINS' employment records, as well as police reports.

10.     On or about April 19, 2016, HAGGINS plead guilty by way of an Alford Plea in the Baltimore City Circuit Court of Baltimore County, Maryland to the offense of Sexual Abuse of a Minor, in violation of the Maryland criminal annotated code. On or about April 19, 2016, he was sentenced to 25 years of incarceration, with all but 7 years of this sentence to be suspended, followed by a 5-year period of probation supervision. As a result of this conviction, HAGGINS is required to register as a Sex Offender for a period of his lifetime.

11.     HAGGINS completed, signed, and acknowledged a State of Maryland – Department of Public Safety and Correctional Services Notice of Sexual Offender Registration requirements form on at least 12 occasions between February 17, 2021, and September 11, 2023.

12.    The following are some of the conditions that HAGGINS has acknowledged and signed in completing the Sex Offender Registration documents:

a.  "You must register every address and physical location where you habitually live with your primary registration agency and in each county where you habitually live. You must notify the designated law enforcement unit that: you habitually live that county and provide them with the address or physical location. If you are absent from one ore [sic] more of the places you habitually live for 5 or more days you must notify local law enforcement within 3 days of that change."

b.  "If you become homeless you must register <u>once a week</u> in person in each county where you habitually live."

c.  "<u>ALL RELEASES FROM ANY PERIOD OF INCARCERATION OR ARREST</u> and all changes in your residence, employment, telephone numbers, internet identifiers, vehicle information must be reported <u>within 3 days</u> of the change to <u>each</u> designated law enforcement unit where you habitually live."

d.  "If you permanently move to a jurisdiction outside of Maryland or to a foreign country you must, <u>3 days prior to the change</u>: 1) provide the new address, copies of passports, tickets, and travel itineraries to your new primary registration agency; 2) register with the designated law

enforcement agency of the new jurisdiction; and 3) comply with any registration requirements in the new jurisdiction of residence."

e.  "If you are absent from where you habitually live for 7 or more days due to travel for business or pleasure, you must, 21 business days prior to leaving: 1) notify, in writing, each designated law enforcement unit where you habitually live of your absence from the locations where you habitually live; 2) provide the addresses and locations of your temporary residences; and 3) provide the dates that you will be absent from the locations where you habitually live. Copies of travel documents may be requested by law enforcement."

f.  "If you begin or terminate employment in MD or another jurisdiction; or begin or end enrollment at an institution of higher education you must, 3 days prior to the change register with the designated law enforcement agency in that jurisdiction."

g.  "Your birthdate, physical description, address, employment, vehicle, and conviction information will be posted on the Sex Offender Registry website."

h.  "A registrant may not knowingly fail to register, knowingly fail to provide the written notice required under §11-705 of this subtitle or knowingly provide false information of a material fact as required by

this subtitle. A registrant may not knowingly fail to provide the information required under §11-706 of this subtitle. A person who violates these provisions for a first offense is guilty of a misdemeanor and on conviction is subject to imprisonment not exceeding 3 years or a fine not exceeding $5,000 or both, and for a second or subsequent offense, is guilty of a felony and on conviction is subject to imprisonment not exceeding 5 years or a fine not exceeding $10,000 or both."

i. "I swear and affirm that I have read or have been read the above requirements and have been provided a copy of this form. I further understand that I must comply with Criminal Procedure Article §11-701 to 11-722 as it relates to my reporting and registration responsibilities and have been explained the penalties of violating such laws."

13.    Due to the COIVD-19 Pandemic, HAGGINS administratively re-registered via phone on: February 23, 2021; April 20, 2021; April 29, 2021, along with a change of address; May 24, 2021; and August 19, 2021.

14.    On November 10, 2021, HAGGINS registered at an address of 3845 W. Forest Park Ave, Apt 9, Baltimore, MD, 21216. HAGGINS did not report any

employment. On January 27, 2022, and April 21, 2022, HAGGINS re-registered with no reported changes in residency or employment.

15.    On June 2, 2022, HAGGINS re-registered along with a Change of Address to 2207 Elsinore Ave, Baltimore, MD, 21216. HAGGINS did not report any employment during this re-registration.

16.    On July 11, 2022, HAGGINS re-registered with no change in residency. HAGGINS reported being employed at Von Moving and Storge. On October 3, 2022, HAGGINS re-registered with no reported changes in residency or employment.

17.    On October 17, 2022, Detective Raynard Johnson of the Baltimore City Police Department added an investigative note to HAGGINS' Offender Watch Report which states, "Offender's address was verified by owner of house. Ms. Rosa Diaz advised that Offender rents a room at 2207 Elsinore Ave. Offender advised that he and his children's mother are constantly at odds over child support and she is constantly trying to get him in trouble or ruin his life. Offender stated that his GF lives in PA where he sometimes visits her but he does not live there with her. Address verification conducted."

18.    On December 27, 2022, HAGGINS re-registered with no reported changes in residency. HAGGINS reported being employed at Chesapeake International Trucking in Portsmouth, VA. On March 15, 2023, June 7, 2023, and

September 11, 2023, HAGGINS re-registered with no reported changes in residency or employment.

19.     Since June 2, 2022, HAGGINS has been registered as residing at 2207 Elsinore Ave, Baltimore, MD, 21216. Between February 17, 2021, and September 11, 2023, none of HAGGINS' sex offender registrations list any vehicles.

20.     On November 17, 2023, HAGGINS was charged by the Pennsylvania State Police—York Barracks under two different dockets: 1) one involving charges of PWID, Possession of Firearm Prohibited, Carrying loaded weapon, driving while operating privilege suspended or revoked, following too closely, and improper sunscreening; and 2) another case for Escape, Flight to Avoid Apprehension/Trial/Punishment, and Evading Arrest of Detention on Foot.

21.     I learned the following by reviewing the Pennsylvania State Police Report and video footage for Incident # PA-2023-1494334, as well as in speaking with the arresting Trooper, Eduardo Beleno. It should be noted that the information below has been summarized, and no attempt has been made to transcribe the entire video recordings. The quotes transcribed below were done to the best of my ability to hear the recording.

22.     On November 17, 2023, at approximately 1100hrs, Trooper Beleno conducted a traffic stop on I-83 in York County, PA on a 2012 Honda Accord bearing Maryland Registration: 3ET8954. Trooper Beleno observed the Honda

Accord following the vehicle in front of it too closely. The Trooper also noted that the windows of the vehicle were tinted to such a degree that he was unable to identify the operator inside of the vehicle. During the traffic stop, Trooper Beleno made contact with the operator, and sole adult occupant, of the vehicle who was ultimately identified as Eric Clarence HAGGINS JR. There was a young child in the back seat of the vehicle.

23.     Trooper Beleno recalled that HAGGINS was utilizing the navigation feature of his cellphone while enroute from Pennsylvania to Baltimore, MD. Trooper Beleno also related that this was the only cellphone in HAGGINS' possession at this time.

24.     Upon contacting the operator, Trooper Beleno detected the odor of burnt marijuana emanating from the inside of the vehicle. As he spoke to HAGGINS, he observed him to have bloodshot eyes and his eyelids were droopy. Trooper Beleno asked HAGGINS to perform Standardized Field Sobriety Tests and he complied with this request. SFST's were administered to evaluate HAGGINS's impairment. During the SFST's, Trooper Beleno observed multiple clues of impairment. Additional tests were conducted on HAGGINS. During that time, Trooper Beleno observed further clues of impairment, which were noted in the police report.

25.     Trooper Beleno asked HAGGINS for consent to search his vehicle. HAGGINS verbally consented to the search of the vehicle, but then denied consent after Trooper Beleno advised him that he wanted to search his entire car.

26.     Trooper Beleno placed HAGGINS into custody and detained him in his cruiser.

27.     Trooper Beleno retrieved HAGGINS' cellphone from the roof of HAGGINS' car.

28.     From the video footage, it appears that HAGGINS repeatedly tries to converse with Trooper Beleno, but Trooper Beleno stops HAGGINS from making any statements until he is provided his Miranda Warnings. Trooper Beleno verbally advised HAGGINS of his Miranda Warnings, and then asks HAGGINS if he understands his rights HAGGINS nodded his head, affirming that he understood.

29.     HAGGINS' wife/girlfriend, Tiffany Mercedes Glover, was still on a phone call with HAGGINS' phone. Trooper Beleno permitted HAGGINS to speak to Glover with HAGGINS' phone to facilitate her picking up the minor child. During this portion of the interaction, HAGGINS (while handcuffed behind his back) utilized his cellphone to 'text his mother to let her know he's being locked up.'

30.   HAGGINS and Trooper Beleno have a discussion about HAGGINS providing information to law enforcement.

31.   HAGGINS's girlfriend, Tiffany Mercedes Glover, arrived on scene of the traffic stop and took custody of the child. She was driving a White Dodge Charger bearing Pennsylvania registration: LZF-3282. This vehicle was found to be registered to both Tiffany Glover and Eric HAGGINS at 7969 Erinvale Lane, Seven Valleys, PA, 17360.

32.   HAGGINS also requested that Trooper Beleno give the house key to GLOVER, indicating that HAGGINS resides with her.

33.   Glover was permitted to retrieve the child's car seat and a diaper bag from the vehicle. Without permission, Glover then took the keys to the vehicle that HAGGINS was driving and left the scene of the traffic stop.

34.   Trooper Beleno asked HAGGINS what the password to his phone is to facilitate a phone call to Glover. HAGGINS provides the passcode, "BLUKID" to access the phone. Glover did not answer this phone call. HAGGINS also provided Trooper Beleno a separate passcode in order to access a text message application on his phone. This passcode was "08120786".

35.   HAGGINS vehicle was seized and then towed to the PSP York barracks.

36.     Trooper Beleno transported HAGGINS to York Hospital for a blood draw. While in route to York Hospital, Trooper Beleno and HAGGINS have various conversations.

37.     Trooper Beleno asks HAGGINS, "What kind of gun is it, that's in there?" HAGGINS responds, "Um, .357" and Trooper Beleno asks, "A what?" HAGGINS states, "A .357. He was selling it for 800. I was actually going down to meet the guy. So I apologize about lying to you about, going down, and she was being in front of me. She actually was rushing back down there. That's what took her so long." Trooper Beleno asks, "It's loaded?" and HAGGINS responds, "Yes." HAGGINS then states something inaudible about his supplier and relates that '..he be getting his weed in the mail, so that's why…"

38.     Trooper Beleno also asks, "You living in Maryland, Annapolis?" HAGGINS responds, "I live. I, I come up here to stay beside my girl. That's where I be staying at." Trooper Beleno responds, "So you can get your address right there on, uh…" HAGGINS says, "Huh?" Trooper Beleno says, "She live out in, uh…" HAGGINS says, "Yeah she lives out…" Trooper Beleno finishes his question, "Seven Valleys?" HAGGINS responds, "Yeah." Trooper Beleno says, "Okay." HAGGINS states, "So I come up here and stay up here sometimes."

39.     Trooper Beleno and HAGGINS have a conversation about information that HAGGINS may be able to provide to PSP. Trooper Beleno also

asks, "So you got the stuff in Maryland, and brought it up here, why?" HAGGINS answers, "No. I didn't get it from Maryland. The guy who live next door to me." Trooper Beleno asks, "In Maryland, right? Oh, in PA." HAGGINS says, "He's in PA." Trooper Beleno states, "Oh. So that's what I'm saying, you can help us out here in PA." HAGGINS says, "Oh, yes, yes."

40.     Trooper Beleno and HAGGINS arrive at Wellspan York Hospital. Following the completion of the blood draw, HAGGINS was transported to PSP York station for an interview.

41.     While in route to PSP York, Trooper Beleno and HAGGINS continue to converse. Trooper Beleno and HAGGINS briefly discuss HAGGINS' criminal history. Trooper Beleno asks, "Are you allowed to carry a gun?" HAGGINS responds, "No, I'm not." Then HAGGINS mumbles something inaudible.

42.     On November 17, 2023, at approximately 1248 hours, Trooper Beleno and Trooper Elliot Wilker conducted a video recorded interview with HAGGINS. Trooper Beleno again advised HAGGINS of his Miranda Rights and HAGGINS elected to waive his Miranda Rights. HAGGINS completed and signed a Pennsylvania State Police Rights Warning and Waiver (SP 7-0019).

43.     During the interview, HAGGINS states, "What I will say is, everything that you find on the inside, where the driver car is, I will take full responsibility of that." Trooper Beleno asks, "As in, like?" HAGGINS responds,

"The, the, the drugs and the gun that I told you was in there. That is definitely mine." HAGGINS then described to the Troopers how the narcotics in the passenger compartment of the car were packaged, the approximate drug amounts, and the location of the gun.

44.     Trooper Wilker says, "…alright, and you were…and, and the gun, talk to me real quick about the gun." HAGGINS goes on to say, "…I was supposed to have sold it a couple days ago, but I was stuck home with my son. Um, my girl, Tiffany, she was in Maryland with her sister. She's supposed to be having a baby, so she stayed at the hospital. Um, I kind of got anxious, cuz I haven't been, you know, in Maryland to sell none of this weed in a couple days. So, I took the opportunity to try to sell the gun that he's been asking me to sell, and I told him that I would take it down to sell it today. And that's what I was in the midst of doing."

45.     Wilker asks, "What kind of gun is it?" HAGGINS responds, ".357" and Wilker asks, "Like a revolver?" HAGGINS answers, "Yes." Wilker asks, "Okay. Is it stolen or anything that you know of?" HAGGINS responds, "That I don't know." Wilker asks, "Loaded?" HAGGINS says, "Yes." HAGGINS goes on to say, "And, but, he definitely has…a 9 compact that he wanted me to sell, but wasn't nobody trying to buy it, at the time. And he have, an assault rifle. I'm not for sure if it's a Heckler or not, but it definitely is a rifle."

46.     HAGGINS provided a street name for his supplier [which was inaudible in the video] and he believed his real name to be "Craig" or "Greg". During their encounter, HAGGINS informed the Troopers that the individual who gave him the gun and narcotics to sell is his neighbor in Seven Valleys, PA.

47.     Wilker asks, "What are you supposed to come back to him with?" HAGGINS responds, "Um, he wanted…200, I think, off of the, the powder, he wanted 200 back off of the powder." Wilker interjects, "Okay." HAGGINS continues, "Um he told me to bring him, maybe six back off of the gun. He wanted six back off of the gun…and the pills, I admit, I chew them, but I sell them for 10 a piece. Um, as far as the weed, I mean, I just sell them for 20 dollars a bag. Wilker, "Gotcha." HAGGINS continues, "So whatever I made off of the, the weed, like he said, he broke down a quarter pound, and I got half of that, the 7 grams, the gun, and the scale. Wilker says, "Alright." HAGGINS interjects, "So." Wilker continues, "…and you were gonna go down, that was all going to Baltimore?" HAGGINS responds, "Yes. Because, and the only reason because, um, I haven't really got familiar with out here. It's kind of hard to navigate." Wilker interjects, "I gotcha." But hes been trying to get me to, you know, kinda navigate out here with him." HAGGINS then describes the locations that his supplier has taken him along to.

48.     Towards the end of the recorded interview, Trooper Beleno asks, "The neighbor is here in PA, right?" and HAGGINS responds, "Yes." When I spoke to Trooper Beleno, he identified the individual who HAGGINS implicated as his supplier as Craig Pringle, who also resides in the 7900 block of Erinvale Lane in Seven Valleys, PA. Trooper Beleno knows Craig Pringle from a from a previous drug arrest he made in July 2023.

49.     HAGGINS completed and signed a Pennsylvania State Police Waiver of Rights and Consent to Vehicle Search (SP 7-0027V) form. Trooper Beleno searched HAGGINS' vehicle and Cpl. Dugan assisted with the search. The following items were seized: a Loaded Black Taurus .357 Mag revolver with 7 rounds—located in the glove compartment; (10) plastic baggies of marijuana; an open plastic baggie of marijuana; a plastic baggie of cocaine; a plastic baggie containing (10) various colored pills; (26) empty plastic baggies; (3) rolled tobacco cigars; folded tin foil; Big Bambu rolling papers; Empty packaging labeled lato pop; and a black digital scale in a box. The Device, HAGGINS' Samsung Galaxy A02s, matte black in color, with a shattered glass screen, and a black phone case was also seized. All the seized items were entered under property record J06-29816A.

50.   Trooper Beleno reviewed HAGGINS' criminal history and confirmed that he is a felon not to possess. He also learned that HAGGINS did not have a concealed carry permit and is not able to obtain one due to his criminal history.

51.   On November 17, 2023, at approximately 1414 hours, while HAGGINS was handcuffed at PSP York, he pulled his hand out from the handcuff and attempted to escape. He was successfully apprehended by PSP members outside of the building (Incident # PA2023-1495274).

52.   On November 17, 2023, HAGGINS was transported to York Central Booking for processing and arraignment on felony and misdemeanors charges. He was subsequently incarcerated at the York County Prison on Docket # MJ-19304-CR-0000308-2023 and Docket # MJ-19304-CR-0000309-2023. Bail was set at $50,000 on each case, which was posted on November 18, 2023. HAGGINS was released from incarceration.

53.   HAGGINS did not notify the Maryland Sex Offender Registry of this arrest or incarceration, as he is required to do.

54.   HAGGINS was due to re-register with the Baltimore Police Department Sex Offender Registry on or before December 11, 2023. HAGGINS failed to update his registration as required by law.

55.    On December 12, 2023, the Baltimore Police Department obtained an arrest warrant for HAGGINS, charging him with Failure to Register as a Sex Offender. The extradition on this warrant is In-State Pick-Up Only.

56.    I contacted PSP Megan's Law Unit to inquire if HAGGINS has ever attempted to register as a sex offender in Pennsylvania. According to Sean Reynolds, who is a Legal Assistant with the PSP Megan's Law Unit, HAGGINS is not currently registered as residing or being employed in the Commonwealth of Pennsylvania, and they have no record of HAGGINS registering or attempting to register in Pennsylvania.

57.    HAGGINS address is 7969 Erinvale Lane, Seven Valleys, PA, 17360 on both Court Dockets (# MJ-19304-CR-0000308-2023 and # MJ-19304-CR-0000309-2023) as well as the PSP Report.

58.    During his entire encounter with the PSP, HAGGINS repeatedly explicitly states and implies that he resides in Pennsylvania. In the referenced portions of the interview, HAGGINS refers to being "stuck home" and he acknowledges that he has not been in Maryland for a couple of days. He also specifies that his girlfriend was in Maryland, indicating that they were in different states. HAGGINS affirms that the source of the narcotics and firearm was his neighbor in Pennsylvania.

59.     I utilized the Pennsylvania Justice Network (JNET) database on November 29, 2023, to query Pennsylvania Labor and Industry information associated with Eric HAGGINS' social security number. This search yielded 2nd Quarter 2022 employment at Wolfgang Operations LLC located at 110 Trooper Ct, York, PA, 17403. I obtained HAGGINS employment records from this location and learned the following. HAGGINS was employed at Wolfgang Confectioners a/k/a Wolfgang Operations LLC located at 110 Trooper Ct, York, PA, 17403 from April 1, 2022, to April 6, 2022. The total amount of his wages is listed as $340.00. HAGGINS' employment documents from this location lists his address as 8 Silverleaf Ct, Apt F, Cockeysville, MD, 21030. HAGGINS' Employee Direct Deposit Election Form requests that HAGGINS' wages/salary be deposited in a Wells Fargo Bank Account in the name of Tiffany Glover.

60.     The address associated with his employment at this location is not associated with HAGGINS' Maryland Sex Offender registrations during this time frame. This employment is not associated with HAGGINS' Maryland Sex Offender registration. HAGGINS did not register this employment in Pennsylvania as required under SORNA.

61.     It should be noted that according to Google Maps, Wolfgang Operations LLC located at 110 Trooper Ct, York, PA, 17403 is approximately 1.2 miles from is 7969 Erinvale Lane, Seven Valleys, PA, 17360.

62.     I conducted a PennDOT records search for Tiffany Glover utilizing JNET. The address associated with Glover's Pennsylvania Driver's License is 7969 Erinvale Lane, Seven Valleys, PA, 17360.

63.     I conducted a search of York County Property records for the address of 7969 Erinvale Lane, Seven Valleys, PA, 17360. The search revealed that the property is owned by Tiffany Glover.

64.     I reviewed HAGGINS' Maryland Sex Offender Registrations and learned that the 2012 Honda Accord bearing Maryland Registration: 3ET8954 is not associated with HAGGINS' sex offender registration information.

65.     I conducted a query utilizing JNET of Pennsylvania Registration: LZF-3282, which is associated with the white Dodge Charger mentioned from the PSP arrest. According to the Pennsylvania Department of Motor Vehicle records, HAGGINS is the co-owner and co-registrant of the 2018 Dodge Charger bearing Pennsylvania Registration: LZF-3282. This vehicle is registered to Tiffany Mercedes Glover and Eric Clarence HAGGINS JR at 7969 Erinvale Lane, Seven Valleys, PA, 17360. According to the Pennsylvania Department of Transportation (PennDOT) records, the title date is September 15, 2022. I reviewed HAGGINS' Maryland Sex Offender Registrations and learned that this vehicle is not associated with HAGGINS' sex offender registration information, and neither is this address.

66.    Based on the above, I applied for a search warrant to search

HAGGINS' cellphone (the Device) for evidence of 18 U.S.C. 2250(a) Failure to

Register, Title 18 U.S.C. § 922(a) Unlawful Transportation of Firearms, and Title

18 U.S.C. § 922(g) Possession of a Firearm by Prohibited Person. This search

warrant was approved by the Honorable United States Magistrate Judge Daryl F.

Bloom on January 30, 2024, and it is docketed at 1:24-MC-0089.

67.    A data extraction of HAGGINS' cellphone (the Device) was

completed with assistance from the Office of the District Attorney, York County

Forensic Investigative Unit. Detective Steven Rowe completed a Forensic

Examination Report of the cellphone. Pursuant to the aforementioned search

warrant, I am in possession of a USB storage device containing the data extracted

from HAGGINS' Samsung Galaxy A02s, bearing IMEI # 357014535818918. I

subsequently reviewed the data and the contents of the phone in accordance with

the search warrant.

68.    While lawfully searching the Device for evidence of violations of 18

U.S.C. 2250(a) Failure to Register, Title 18 U.S.C. § 922(a) Unlawful

Transportation of Firearms, and Title 18 U.S.C. § 922(g) Possession of a Firearm

by Prohibited Person, I reviewed the contents of the phone and created numerous

PDF reports of images, text messages, messages, contacts, GPS locations, and

other evidence.

69.     The information contained in the Device is likely to assist in
identifying other potential co-conspirators and individuals engaged in criminal
activity who HAGGINS was communicating with regarding the sale of narcotics.
The information contained in the Device is also likely to reveal information
regarding HAGGINS' intent to sell narcotics, and his propensity to be around and
possess firearms.

70.     During the search of HAGGINS' cellphone, I observed numerous
images and messages indicating that HAGGINS is involved in the sale and
distribution of narcotics in violation of 21 U.S.C. 841(a), and he possesses firearms
in violation of 18 U.S.C. §922(g) and 18 U.S.C. §924(c).

71.     On August 1, 2023, HAGGINS and Tiffany Glover have a
conversation in which HAGGINS implicates himself as being in possession of a
stolen car "with guns and bodies on them," he indicates that he was stranded in
Virginia, that he was involved in a shooting, and he states that he is in possession
two firearms—one of which he claims to be Glover's.

72.     The above is substantiated by a text thread from August 2, 2023,
between Craig Pringle and HAGGINS. HAGGINS tells Pringle that he is in
Virginia. Pringle says "Shaggin" which appears to be in the form of a question
based on the context of the messages. HAGGINS responds, "Nah. Nigga been
spinning. Found slim ppls in pg DC and va. I'm not letting up" and "Told nigga

stole lil buddy out my car. I'm on his ass. Broke. Beefing with baby. She on my ass" and "And she not understanding". A few messages later, HAGGINS texts, "Smh. I'm tired bruh. And baby mad enough to dip on a nigga. She think it's a bitch but she don't understand. Nigga crossed the line. I need my shit. I told him. Give me my shit or I'm keep spinning. He don't know me. He know my man. I told him. Ima clean his bloodline". Pringle responds, "Smdh Niggs is wild" and "So what ya man say?" To which HAGGINS responds, "He booked. Got into a shoot out with the nigga. With my shit." Pringle says, "Smh bruh" and "U might gotta let that sizzle some". HAGGINS responds, "Ik bruh. I'm just so fucking madd. Nigga gotta die".

73.    A text thread was observed in the data from August 20, 2023, between HAGGINS and Glover. In this string of messages, HAGGINS discusses an incident he was involved in, and he says, "N I need u to report the gun stolen. It's dirty now" and "We gonna keep it but it's dirty".

74.    A message thread was viewed between HAGGINS' Facebook Account and Facebook user Account # 100032198839060 or username Tierra Fulton. On September 21, 2023, HAGGINS messages Fulton, "I'll hit u when I get in the city" and she responds, "Rd if not at work". HAGGINS then replies, "What time u get off. Il come by if you tryna grab up". On September 22, 2023, Fulton messages HAGGINS, "Hey my bad wyd I was washing". HAGGINS replies,

"Cooling. Just got in the city. I'll be around for a couple hours so let me know if you or anyone tryna get some skittles" and then Fulton responds, "Ok". A search of resources for drug slang revealed that skittles can be a term used for MDMA, Cough Medicine, and/or Ritalin.

75.     A text thread was viewed between HAGGINS and a contact saved in his phone as "Charlie". On September 23, 2023, HAGGINS texts Charlie and says, "Lil bruh. Hit my phone. I got something for u". Charlie responds, "Who this" and HAGGINS replies, "Thie E bruh". A review of the timeline revealed that a phone call occurred between HAGGINS and Charlie lasting 50 seconds. On October 13, 2023, HAGGINS texts Charlie, "I'm back on with the soft" and Charlie responds, "Ard bet". HAGGINS then says, "Holla at me". Based on training and experience, I know "soft" to be a term used for powder cocaine.

76.     A text thread was viewed between HAGGINS and a contact saved in his phone as "Truf". On September 23, 2023, Truf texts HAGGINS an image of what appears to be marijuana buds. HAGGINS responds, "What's the number on that" and Truf replies, "40 for 1 [new paragraph] 2 for 60". A few hours later HAGGINS texts Truf, "Bruh. I got some soft. And dome skittles". Truf replies "Fr". HAGGINS says, "Yeah." and "10 for 50 for you."

77.     Between October 16 and October 22, 2023, HAGGINS and Glover have numerous conversations. During this timeframe, HAGGINS tells Glover that

his friend "Dump" wants to take a trip to Memphis and offers for her and their son to go with him. Glover asks HAGGINS the reason for HAGGINS going, and he responds, "He wanna meet the big connect. I think. Or pick up some work in a large quantity". Glover responds, "That's more of dangerous thing. Don't think we should be there for that ." On October 18, 2023, HAGGINS and Glover discuss when the trip may occur and the knowledge that someone named "Angie" has about the trip. Glover says, "Member she said to you bout look out for him", then HAGGINS responds, "Nah. She meant while he out here running around. Told ypu someone shot at him". Then on October 19, 2023, HAGGINS texts Glover, "I no u gonna be mad but can u send me money for grass and food please. This nigga talking paying me tomorrow. Weekly" and "Full time security. He scared shit less". Glover responds, "Ok so once again what about us ...? Or are we not seeing u?" and HAGGINS says, "Yes you r baby. A lil later. I'm boyt to be sitting him at the stash spot. I need to smoke and I wanted food. I told you today. It will be today. I informed you yesterday I wouldn't make it. Today is different". Based on the above it appears that HAGGINS is conducting security for an associate of his and a stash house. Based on training and experience I know a stash house or stash spot to be a term used to describe a location that narcotics are stored.

78.     Then on October 21, 2023, HAGGINS asks Glover, "Baby. Can I get a couple more dollars please. I need to get my own bullet and a black hoodie".

Glover responds, "How much" and HAGGINS replies, "The same you just sent. Ima go to foreman mills. Then to get bullets. But gass first". A review of the timeline shows that a phone call occurred between HAGGINS and Glover for 7:44. Approximately thirty (30) minutes later, Glover sends $50 to HAGGINS through Cash App.

79.     On October 22, 2023, HAGGINS texts Glover, "Smh. That nigga went to Memphis. Him and his son. [EMOJIS] I'm hit one of the runners. Ima start a war." and "No body gonna think it's me. Ima hit two of his blocks tonight. Fuck him. And he gonna die when he come back". Based on training and experience I know the term runner to refer to someone who sells drugs for someone above them within their own organization.

80.     A text thread was viewed between HAGGINS and an individual who was identified as Candice Gaines. On November 9, 2023, Gaines texts HAGGINS, "How much for a zip of soft". HAGGINS responds, "I don't have a zip baby", "I have maybe 12gs left. Idk", and "This shit definitely pack!!" Gaines responds, "Ok". Based on experience and training I know a zip of soft to be one ounce of powder cocaine and for "gs" to be the measurement grams.

81.     Additionally, during HAGGINS' recorded interview with PSP, HAGGINS admits that he was planning to sell the marijuana and cocaine that was found in the vehicle he was driving. Furthermore, according to the PSP report, the

firearm that was seized by PSP was found in the glovebox which is the same location that the narcotics were found.

82.     Based on my training, knowledge, and experience, I know that fugitives and individuals who are actively engaged in criminal activity utilize cellphones as a wireless telephone, GPS devices, digital cameras, and they utilize mobile applications, and social media to communicate with others, specifically associates and family members. The data contained on a cellphone often contain photos of the user and family members/associates, geo-location data with dates and times, and the content of messages often indicates one's plans and locations. Further, the data contained on a cellphone often indicates ownership as well as cellphone provider and account information.

83.     Based on the aforementioned factual information, I respectfully submit that there is probable cause to believe that the Device, listed in Attachments A to this affidavit, which is incorporated herein by reference, contains evidence and fruits of the crime which will aid in the investigation of violations of Title 18 U.S.C. §924(c) Possession of Firearm in Furtherance of Drug Trafficking and Title 21 U.S.C. §841(a)(1) Possession with Intent to Distribute a Controlled Substance. Therefore, this warrant seeks to search all records on the Device described in Attachment B from March 1, 2022, that relate to these violations.

84.    Therefore, while the USMS had the lawful authority to search the

Device for violations of the crimes previously mentioned, we seek this search

warrant based on probable cause the device contains evidence of violations of 18

U.S.C. § 924(c) and 21 U.S.C. 841(a)(1).

85.    The data extracted from the Device is currently with the investigative

casefile at the United States Marshals Service, 1501 N. 6th Street, Room 204,

Harrisburg, PA, 17102. In my training and experience, I know that the data

extracted from the Device has been stored in a manner in which its contents are, to

the extent material to this investigation, in substantially the same state as they were

when the Device first came into the possession of the USMS.

## TECHNICAL TERMS

86.    Based on my training and experience, I use the following technical

terms to convey the following meanings:

      a. Wireless telephone:  A wireless telephone (or mobile telephone, or

          cellular telephone) is a handheld wireless device used for voice and

          data communication through radio signals.  These telephones send

          signals through networks of transmitter/receivers, enabling

          communication with other wireless telephones or traditional "land

          line" telephones.  A wireless telephone usually contains a "call log,"

          which records the telephone number, date, and time of calls made to

and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device. Wireless telephones typically contain programs called applications or apps, which, like programs on a personal computer, perform different functions and save data associated with those functions.  Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

b. Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage

medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such

navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.  PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run

computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.  IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

g.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

87.     Based on my training, experience, and research, and from consulting

the manufacturer's advertisements and product technical specifications, I know

that the Device has capabilities that allow it to serve as a wireless telephone, digital

camera, GPS navigation device, PDA, and to access the internet. In my training

and experience, examining data stored on devices of this type can uncover, among

other things, evidence that reveals or suggests who possessed or used the device

and location data.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

88.     Based on my knowledge, training, and experience, I know that

electronic devices can store information for long periods of time.  Similarly, things

that have been viewed via the Internet are typically stored for some period of time

on the device.  This information can sometimes be recovered with forensics tools.

89.     *Forensic evidence.*  As further described in Attachment B, this

application seeks permission to locate not only electronically stored information

that might serve as direct evidence of the crimes described on the warrant, but also

forensic evidence that establishes how the Device was used, the purpose of its use,

who used it, and when.  There is probable cause to believe that this forensic

electronic evidence might be on the Device because:

      a. Data on the storage medium can provide evidence of a file that was

          once on the storage medium but has since been deleted or edited, or of

a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b.  Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process.  Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a device was used, the purpose of
    its use, who used it, and when, sometimes it is necessary to establish
    that a particular thing is not present on a storage medium.

f.  I know that when an individual uses an electronic device, the
    individual's electronic device will generally serve both as an
    instrumentality for committing the crime, and also as a storage
    medium for evidence of the crime.  The electronic device is an
    instrumentality of the crime because it is used as a means of
    committing the criminal offense.  The electronic device is also likely
    to be a storage medium for evidence of crime.  From my training and
    experience, I believe that an electronic device used to commit a crime
    of this type may contain: data that is evidence of how the electronic
    device was used; data that was sent or received; and other records that
    indicate the nature of the offense.

90.  *Nature of examination.*  Based on the foregoing, and consistent with
Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of
the device consistent with the warrant.  The examination may require authorities to
employ techniques, including but not limited to computer-assisted scans of the
entire medium, that might expose many parts of the device to human inspection in
order to determine whether it is evidence described by the warrant.

*Manner of execution.*  Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## **CONCLUSION**

I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

## **ATTACHMENT A**

The property to be searched is Eric HAGGINS' Samsung Galaxy A02s, bearing IMEI # 357014535818918 hereinafter the "Device."  The data from the Device was previously extracted and its contents were placed on a USB drive that is currently located at The United States Marshals Service, 1501 N. 6th Street, Room 204, Harrisburg, PA, 17102.

This warrant authorizes the forensic examination of the Device and the data extracted from the Device for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

All records and information on the Device described in Attachment A that relate to violations of Title 18 U.S.C. §924(c) Possession of Firearm in Furtherance of Drug Trafficking and Title 21 U.S.C. §841(a)(1) Possession with Intent to Distribute a Controlled Substance and involve **Eric Clarence HAGGINS Jr.** since **March 1, 2022**, including:

a.  location data;

b.  records of incoming and outgoing voice communications;

c.  records of incoming and outgoing text messages;

d.  the content of incoming and outgoing text messages;

e.  voicemails;

f.  images and their metadata;

g.  videos and their metadata;

h.  voice recordings;

i.  contact lists;

j.  the content of incoming and outgoing text e-mails;

k.  data and emails from email applications (including Google Mail, or Gmail, Yahoo!, and Outlook),

l. data from third-party applications (including social media applications like Facebook and Instagram and messaging programs like WhatsApp and Snapchat);

m. browser history;

n. evidence of the times the Subject Devices were used;

o. passwords, encryption keys, and other access devices that may be necessary to access the Subject Devices;

p. any information recording HAGGINS' schedule or travel;

q. all bank records, checks, credit card bills, account information, and other financial records.

Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

a. records of Internet Protocol addresses used;

b. records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

With respect to the search of any of the items described above which are stored in the form of magnetic or electronic coding on computer media or on media capable of being read by a computer with the aid of computer-related equipment (including CDs, DVDs, thumb drives, flash drives, hard disk drives, or removable digital storage media, software or memory in any form), the search procedure may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein, while permitting government examination of all the data necessary to determine whether that data falls within the items to be seized):

    a. surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for markings it contains and opening a drawer believed to contain pertinent files);

b.  "opening" or cursorily reading the first few "pages" of such files in order to determine their precise contents;

c.  "scanning" storage areas to discover and possible recover recently deleted files;

d.  "scanning" storage areas for deliberately hidden files; or

e.  performing key word searches or other search and retrieval searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

With respect to the search of the information provided pursuant to this warrant, law enforcement personnel will make reasonable efforts to use methods and procedures that will locate and expose those categories of files, documents, communications, or other electronically stored information that are identified with particularity in the warrant while minimizing the review of information not within the list of items to be seized as set forth herein, to the extent reasonably practicable.  If the government identifies any seized communications that may implicate the attorney-client privilege, law enforcement personnel will discontinue its review and take appropriate steps to segregate all potentially privileged information so as to protect it from substantive review.  The investigative team will take no further steps regarding any review of information so segregated absent

further order of the court.   The investigative team may continue to review any information not segregated as potentially privileged.

The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.